**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| |
|---|
| **ROBERT BURCK d/b/a THE NAKED COWBOY,**<br><br>                        **Plaintiff,**<br><br>    **v.**<br><br>**MARS, INCORPORATED**<br><br>      **and**<br><br>**CHUTE GERDEMAN, INC.,**<br><br>                             **Defendants.** |

C.A. No. 08 Civ. 1330-DC

**OPPOSITION TO PLAINTIFF'S MOTION TO STRIKE DEFENDANT MARS, INCORPORATED'S FAIR USE AND PARODY AFFIRMATIVE DEFENSES**

## TABLE OF CONTENTS

Page

SUMMARY OF ARGUMENT ................................................................. 1

FACTUAL ALLEGATIONS ................................................................... 2

ARGUMENT ........................................................................................ 3

    A.    Standard of Review ................................................................. 3

    B.    Mars's Answer Properly Pleads the Affirmative Defenses of Parody and Fair Use .......................................................................... 5

        1.    Burck's Motion Mischaracterizes Second Circuit Trademark Parody Jurisprudence ............................................................ 5

            a.    Courts in this Circuit Consider Parody in the Context of the *Polaroid* Factors .................................................... 6

            b.    First Amendment Balancing Approach to Trademark Parody Cases ................................................................ 11

        2.    The Parody Doctrine is Not Limited to Situations Where the Defendant is Selling Novelty Products ................................ 15

    C.    Burck Cannot Demonstrate that Parody—as a Matter of Law—Is Not a Viable Defense to His Right of Publicity Claim .................................. 20

CONCLUSION ..................................................................................... 21

## SUMMARY OF ARGUMENT

Defendant Mars, Incorporated ("Mars"), by and through counsel, hereby submits this memorandum in opposition to Plaintiff Robert John Burck's d/b/a The Naked Cowboy ("Burck") motion to dismiss certain of Mars's affirmative defenses pursuant to Rule 12(f) of the Federal Rules of Civil Procedure ("Motion").  Because Mars's defenses are viable based on the facts as alleged, Burck's Motion should be denied.

Burck's motion, asking the Court to strike Mars's affirmative defenses of fair use and parody, is premised on a flawed reading of Second Circuit jurisprudence.  Contrary to Burck's view it is clearly not the case that parody is never a viable defense when the parody at issue is used in a commercial context.  Nor is it the case that a trademark infringement defendant may invoke parody only where the defendant's goods are themselves parodies.  Courts in the Second Circuit regularly apply the *Polaroid* factors in examining claims of parody.  Under this approach, even where the defendant uses parody to sell ordinary consumer goods and services, the defendant will prevail if differences in the parties' marks and goods make it clear to consumers that the defendant's use is a parody, thereby preventing a likelihood of confusion among consumers that the defendant's use is actually endorsed by the plaintiff.

Here, Mars's M&M'S® Cowboy Characters constitute parody, not infringement, because consumers will clearly recognize the obvious comical adaptation of Burck's "trademarked get-up" as the joke it was intended to be.  This is particularly true since the context in which the M&M'S® Cowboy Characters appear—amongst numerous other parodies of familiar New York characters and experiences—underscores the fact that this is an obvious parody.  Applying the *Polaroid* analysis, courts have found parody, not infringement, where the defendant sells ordinary consumer goods, such as beer, jeans and casino gambling services, in light of the fact

that other differences, e.g., differences between the parties' marks and goods, rendered consumer confusion unlikely.   That is exactly the situation here.  Mars's M&M'S® Cowboy Characters contain obvious differences from Burck's "trademarked get-up," namely, the insertion of the famous M&M'S® Characters into cowboy attire, such that the joking imitation of Burck's "trademarked get-up" will be obvious to consumers.[1]

Burck's contention that parody, as a matter of law, is not a viable defense to a right of publicity claim is also unfounded.  Burck cites no authority—nor can he—for this novel contention and quite to the contrary, courts across the country have concluded that parody can indeed be a viable defense to a right of publicity claim.  Moreover, as fully set forth in Defendants' Motion to Dismiss and for Judgment on the Pleadings, Burck's right of publicity claim is defective on its face because it does not allege that Defendants used Burck's "portrait or picture," and as a result, fails as a matter of law.

For these reasons, Burck has not met his burden of showing that Mars's parody and fair use defenses should be stricken and his Motion should therefore be denied.

## FACTUAL ALLEGATIONS

Burck alleges that over the past decade, he has "performed as a street entertainer in New York City's Times Square under the persona known as The Naked Cowboy."  (Compl. ¶ 5.)  Burck alleges that he "has performed live for hundreds of thousands of people in his trademarked get-up, which features a white cowboy hat, white cowboy boots, white underpants, and an acoustic guitar."  (*Id*. ¶ 6.)  According to Burck's Complaint, his "name and likeness are registered trademarks" and as a result of his appearances in a variety of television programs,

---

[1]    It has long been common practice for Mars to "dress" the M&M'S® Characters in clothing or with accessories.

movies and music videos, Burck is a "prominent and well-known persona."  (*Id*. ¶¶ 10-17, 20-21.)

Burck contends that Defendants have violated his rights because "[s]ince April 2007, on two oversize video billboards situated in the heart of Times Square, Mars has been running an animated cartoon advertisement featuring a blue 'M&M' dressed up exactly like The Naked Cowboy—white underwear, white cowboy hat, white cowboy boots, and white guitar included." (Compl. ¶ 26.)  Burck asserts that this usage is "unmistakably a reference to, and incorporation of, The Naked Cowboy's trademarked likeness."  (*Id*. ¶ 27.)  In addition, Burck asserts that "[t]here is also a pictorial version of the 'Naked Cowboy' M&M … [which] depicts a yellow M&M [sic] posing in the same trademarked get-up" used by Burck.  (*Id*. ¶ 30.)  The two M&M'S® Character images with which Burck takes issue are hereinafter referred to as the "M&M'S® Cowboy Characters."  Burck contends that Mars is liable for both false endorsement under Lanham Act Section 43(a) and for violating his right of publicity under section 51 of the New York Civil Rights Law.

In its Answer Mars admits that its Times Square video depicted the Blue M&M'S® Character wearing "a white cowboy hat, white gloves, cowboy boots, white briefs, holding a guitar, standing in Times Square."  (Answer ¶ 26.)  Mars also admits that in the interior of its M&M'S WORLD® store, it displayed a mural that included an image of the Yellow M&M'S® Character dressed in the same cowboy attire.  (*Id*. ¶ 30.)

## ARGUMENT

### A.    *Standard of Review*

It is well-established that "[m]otions to strike an affirmative defense for legal insufficiency under Fed. R. Civ. P. 12(f) are not viewed favorably by the courts."  *Bennett v.*

*Spoor Behrins Campbell & Young, Inc.*, 124 F.R.D. 562, 563 (S.D.N.Y. 1989). Thus, "[t]hree prerequisites must be satisfied before a motion to strike an affirmative defense will be granted." *Estee Lauder, Inc. v. Fragrance Counter, Inc.*, 189 F.R.D. 269, 271 (S.D.N.Y. 1999). First, the motion "will not be granted 'unless is appears to a certainty that plaintiff[] would succeed despite any state of the facts which could be proved in support of the defense.'" *Id.* (quoting *William Z. Salcer, Panfeld, Edelman v. Envicon Equities Corp.*, 744 F.2d 935, 939 (2d Cir. 1984), *vacated on other grounds*, 478 U.S. 1015 (1986)). In making this determination, the court must construe the pleadings liberally in the defendant's favor, and the court "must accept the matters well pleaded as true." *Bennett*, 124 F.R.D. at 564; *Durant v. Traditional Invs., Ltd.*, No. 88 Civ. 9048 (PKL), 1990 WL 160672, at *2 (S.D.N.Y. Oct. 15, 1990); *see also Tompkins v. R.J. Reynolds Tobacco Co.*, 92 F. Supp. 2d 70, 80 (N.D.N.Y. 2000) ("the defendant's pleadings are to be construed liberally so as to give the defendant a full opportunity to support its claims after discovery has been made").

Second, "there may be no substantial question of law, a resolution of which could allow the defense to succeed." *FDIC v. Pelletreau & Pelletreau*, 965 F. Supp. 381, 389 (E.D.N.Y. 1997); *see also Oliner v. McBride's Indus., Inc.*, 106 F.R.D. 14, 17 (S.D.N.Y. 1985) ("If the sufficiency of the defense depends upon disputed questions of law or fact, then a motion to strike will be denied."). In this regard,

> even when the facts are not disputed and the defense presents a purely legal question, the courts are very reluctant to determine disputed, substantial questions of law on a motion to strike … [because] [t]hese questions are viewed as more properly determinable only after adequate discovery and, if necessary, a complete hearing on the merits.

*Bennett,* 124 F.R.D. at 563-64 (citing *Sample v. Gotham Football Club, Inc.*, 59 F.R.D. 160, 169 (S.D.N.Y. 1973)).

Finally, "a motion to strike will be granted only if there is a clear showing that the challenged defense has no bearing on the subject matter" of the litigation and that "permitting the defense to stand would prejudice the plaintiff." *Oliner*, 106 F.R.D. at 17.

**B.    *Mars's Answer Properly Pleads the Affirmative Defenses of Parody and Fair Use.*[2]**

**1.    Burck's Motion Mischaracterizes Second Circuit Trademark Parody Jurisprudence.**

Burck's Motion is premised on a misunderstanding of this Circuit's trademark parody jurisprudence. Contrary to Burck's argument on brief, it is clearly not the case that parody can never be a viable defense when the parody at issue is used in a commercial context. Nor is it the law that the message conveyed by a trademark parody must meet the rigorous *copyright* fair use standard enunciated by the U.S. Supreme Court in *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569 (1994).[3] Rather, courts in this Circuit have used two approaches in

---

[2]    Mars's affirmative defenses of parody, fair use, and the "free speech provisions of the First Amendment" are all related. As explained by the court in *Yankee Publishing, Inc. v. News America Publishing, Inc.*, 809 F. Supp. 267, 279 (S.D.N.Y. 1992), "parody is merely an *example* of the types of expressive content that are favored in fair use analysis under the copyright law and First Amendment deference under the trademark law." *Id.* The court also explained that under Second Circuit cases "the message of [those] cases is not merely that *parody* is accorded First Amendment deference, but rather that the use of a trademark in the communication of *an expressive message* is accorded such deference." *Id.* Thus, a court may find that a trademark defendant's expressive work is entitled to First Amendment or "fair use" protection, even if the work does not technically meet the definition of a "parody." *See id.* at 279-80.

[3]    Burck cites only one decision that has applied the language of *Campbell v. Acuff-Rose* to a *trademark* parody case. That case, *Harley Davidson, Inc. v. Grottanelli*, 164 F.3d 806 (2d Cir. 1999), involved much different facts than those at issue here. In *Grottanelli*, the defendant adopted a modified bar-and-shield logo that was highly similar to Harley Davidson's bar-and-shield logo, and used it *as a trademark for his competing motorcycle repair business*. On those facts, the court held that the defendant was plainly attempting to take a free ride on Harley-Davidson's goodwill, rather than making any comment on Harley-Davidson. *See id.* at 812-13. Here, in stark contrast, and as detailed more fully below, Mars has not used Burck's "trademarked get-up" as a trademark for Mars's business, Mars is not a competitor of Burck, and Mars's use is in the context of an expressive work. Consequently, *Grottanelli* is not helpful to Burck's position. Moreover, as discussed below, the analysis used by courts in this Circuit for

analyzing trademark parody cases.  Under either approach, Mars's M&M'S® Cowboy Characters constitute parody as a matter of law.

### a.  Courts in this Circuit Consider Parody in the Context of the *Polaroid* Factors.

Courts in this circuit approach trademark parody cases by applying the factors delineated in *Polaroid Corp. v. Polaroid Electronics Corp.*, 287 F.2d 492, 495 (2d Cir. 1961) ("*Polaroid* factors").[4]  As this Court has explained, "parody is not really a separate 'defense' as such, but merely a way of phrasing the traditional response that customers are not likely to be confused as to source, sponsorship or approval."  *Tommy Hilfiger Licensing, Inc. v. Nature Labs, LLC*, 221 F. Supp. 2d 410, 416 (S.D.N.Y. 2002); s*ee also Schieffelin v. Jack Co. of Boca, Inc.*, 725 F. Supp. 1314, 1323-24 (S.D.N.Y. 1989) ("Courts in this Circuit have considered the ramifications of parody in terms of the [*Polaroid*] factors … more specifically, in terms of whether the products are similar and whether actual consumer confusion could exist as to the source of the allegedly infringing product.).  In this regard, "[w]hen satire or parody is taken to a certain degree … it becomes clear that the owner of the trademark was not involved in the manufacture or sponsorship of the defendant's product."  *Schieffelin*, 725 F. Supp. at 1324.

---

trademark parody does not require reference to *Campbell*'s copyright fair use standard.  Instead, courts typically analyze trademark parody solely in the context of the *Polaroid* factors, or alternatively by first analyzing the First Amendment interests at stake in the defendant's use, and then applying the *Polaroid* factors to determine whether there is any likelihood of consumer confusion.

[4]    The "*Polaroid* factors" are the factors first enunciated by the Second Circuit in *Polaroid Corp. v. Polarad Electronics Corp.*, 287 F.2d 492, 495 (2d Cir. 1961), and which are now routinely used by courts in this Circuit to analyze Lanham Act claims.  Specifically, those factors are (1) the strength of the plaintiff's trademark; (2) the degree of similarity between the parties' marks; (3) the proximity of the products; (4) the likelihood that the plaintiff will "bridge the gap" between the products; (5) the existence of actual confusion; (6) the defendant's good faith; (7) the quality of the defendant's product; and (8) the sophistication of the consumers.  *Id.*; *see also Merck & Co. v. Mediplan Health Consulting, Inc.*, 425 F. Supp. 2d 402, 411 (S.D.N.Y. 2006).

Under this approach, even where the defendant uses parody in connection with ordinary consumer products, courts find in favor of the defendant where the differences in the parties' marks and goods—and application of the other *Polaroid* factors—makes it clear to consumers that the defendant's use is a parody, thereby preventing the mistaken impression that the defendant's use is actually endorsed by the plaintiff. *See, e.g., Universal City Studios, Inc. v. Nintendo Co.*, 746 F.2d 112, 116 (2d Cir. 1984) (finding that defendant's video game was a parody, not infringement, because "the fact that Donkey Kong so obviously parodies the King Kong theme strongly contributes to dispelling confusion on the part of consumers").

For example, the court in *New York Stock Exchange, Inc. v. New York, New York Hotel LLC*, 293 F.3d 550 (2d Cir. 2002) held that a New York-themed casino's use of variations of the plaintiff's trademarks constituted parody, not infringement. In *New York Stock Exchange*, the plaintiff complained that the defendant had infringed its "NEW YORK STOCK EXCHANGE" and "NYSE" marks by using the names "New York $lot Exchange" and "NY$E" in its New York-themed casino in Las Vegas. *Id.* at 553-54. The casino also featured famous New York "neighborhoods" and "notable icons of New York City throughout its interior and exterior decor," including the use of a "Las Vegas showgirl dressed as the Statue of Liberty, the Manhattan Express roller coaster, as well as any number of other similar thematic devices." *Id.* at 555. The Second Circuit analyzed the parody issue in the context of the *Polaroid* factors,[5] stating that under the "similarity of the marks" factor, the defendant's "versions of NYSE's marks … are so obviously modified that any viewer would understand that the Casino was engaged in a parody or humorous play on words." *Id.* Moreover, the court reasoned, the

---

[5]    The Second Circuit did not conduct any separate First Amendment analysis, making it clear that such analysis is not a prerequisite in parody analysis in the Second Circuit. *See also Hormel Foods Corp. v. Jim Henson Prods.*, Inc., 73 F.3d 497, 502 (2d Cir. 1996) ("In this circuit, claims for infringement usually are analyzed under the eight-factor *Polaroid* test.").

defendant's "other playful uses of the New York City theme … would further underline the obvious" parody embodied in the defendant's use.  *Id*.  Thus, the Court upheld the district court's entry of summary judgment for the defendant on the plaintiff's trademark infringement claim.

Likewise, the court in *Hormel Foods Corp. v. Jim Henson Productions, Inc.*, 73 F.3d 497, 502 (2d Cir. 1996), noting that "[i]n this circuit, claims for infringement usually are analyzed under the eight-factor *Polaroid* test," held that the defendant's sale of merchandise under the name "Spa'am" was a parody, and did not infringe the plaintiff's SPAM trademark.  *Id*. at 502.  Applying the *Polaroid* analysis, the court emphasized that because "the two marks appear in strikingly different contexts and project wholly different visual displays," consumers would see the defendant's use as an obvious parody, and would not be confused.  *Id*. at 504.

Other jurisdictions have taken this same approach, relying solely on analysis of the likelihood-of-confusion factors to find that a defendant's use is parody and not infringement. *See, e.g., Jordache Enters., Inc. v. Hogg Wyld, Ltd.*, 828 F.2d 1482, 1485 (10th Cir. 1987) (because of dissimilarity of the parties' marks, namely, defendant's sale of jeans under "Lardashe" name and accompanying logo featuring a "large, brightly colored pig head and two hooves," the defendant's use would be understood by consumers as a parody of the plaintiff's JORDACHE trademark); *Eveready Battery Co. v. Adolph Coors, Inc.*, 765 F. Supp. 440, 450 (N.D. Ill. 1991) (the "unmistakable *differences* between the Energizer Bunny and [Mr.] Nielsen in modified rabbit attire" would convey to consumers that the defendant's use was a parody).

Applying the *Polaroid* analysis here, it is readily evident that Mars's M&M'S® Cowboy Characters are parodies.  Like the parodies in *New York Stock Exchange* and *Hormel*, Mars's M&M'S® Cowboy Characters embody numerous obvious changes to Burck's "trademarked get-up" that clearly convey to consumers that the use is a parody.   The marks at issue are Burck's

8

alleged "trademarked likeness" (consisting of Burck dressed in a white cowboy hat, underpants, and boots while holding a guitar) and Defendants' famous M&M'S® Characters, which consist of the famous Yellow and Blue M&M'S® Characters with the visible "M" on their M&M'S® bodies, white gloves, mouths, large oval eyes, eyebrows, hands and feet, attired in an alleged imitation of the Naked Cowboy's "trademarked get-up."[6]  On the facts as alleged, Mars's Characters are classic examples of parody.  The images conjure up just enough of Burck's trademark—specifically, the hat, boots, underpants and guitar—for consumers to recognize the target of the parody, while at the same time making "obvious changes to the marks that constitute the joke," namely, the depiction of the cowboy attire on the bodies of animated M&M'S® Characters, rather than on Burck himself.  *See Tommy Hilfiger Licensing, Inc.*, 221 F. Supp. 2d at 416.

Over the last decade, if not longer, Mars has been dressing and accessorizing its M&M'S® Characters in every imaginable outfit in humorous imitation of literally hundreds of figures, ranging from the Phantom of the Opera to Clint Eastwood in The Good, the Bad and The Ugly.  Much like the Muppet characters, the M&M'S® Characters and their humorous antics and imitations have become a widely enjoyed brand of humor.  Mars's humorous parodies are perfectly analogous to those at issue in *Hormel*, a decision which could be applied virtually verbatim to support the finding here that Mars's imitation of Burck's Naked Cowboy "is simply another in a long line of [M&M'S® Character] lampoons.  Moreover, this [M&M'S® Character]

---

[6]     While Burck's Complaint does not detail the characteristics of the M&M'S® Characters, the Court may take judicial notice of them as they are available on Mars's M&M'S® website at http://us.mms.com/us/about/characters.  *See* Fed. R. Evid. 201; *Bridgeway Corp. v. Citibank*, 45 F. Supp. 2d 276, 278 n.2 (S.D.N.Y. 1999) (taking judicial notice of historical information on Liberia on the "Geocities" website).  *See also Laborers' Pension Fund v. Blackmore Sewer Constr., Inc.*, 298 F.3d 600, 607 (7th Cir. 2002) (taking judicial notice of information regarding a bank's ownership from the bank's website).

brand of humor is widely recognized and enjoyed.  Thus, consumers of [Mars's] merchandise, all of which will display the [M&M'S® trademarks], are likely to see the [M&M'S® Cowboy Characters] as the joke it was intended to be."  *Hormel*, 73 F.3d at 503.

Moreover, as in *New York Stock Exchange*, the context in which Mars's M&M'S® Cowboy Characters appear underscores that this is a parody of familiar New York characters.  In both the mural and video, the M&M'S® Cowboy Characters do not appear in isolation, but are depicted amongst numerous other parodies of New York characters and scenes, including an image of the Green M&M'S® Character dressed as the Statue of Liberty and Marilyn Monroe, and the Red M&M'S® Character as King Kong scaling the Chrysler Building.  As such, these "other playful uses of the New York City theme … would further underline the obvious" fact that Mars's use is a parody, rather than an endorsement by Burck.  *See New York Stock Exchange, Inc.*, 293 F.3d at 555.

For these same reasons Mars could dress it's M&M'S® Characters up in a baseball uniform—even one with the number '2' on it—and it would be permissible parody.  Burck suggests such a scenario with his rhetorical question: "[i]f Mars had dressed its M&Ms [sic] up in Yankees pinstripes bearing the number '2,' can it really be the case that Derek Jeter would just have to accept the fact that he is now an unwitting endorser of candy?"  (Mot. 2.)  Burck ignores the not-so-subtle difference between dressing an a male actor up in a baseball uniform with the number '2' and dressing an M&M'S® Character in the same attire.  In the latter case, it is axiomatic that the M&M'S® Character dressed as a baseball player with whatever number on it, is still quite obviously a big round or oval, colored, animated M&M'S® Character—not a person.  As the Tenth Circuit concluded in *Cardtoons, L.C.  v. Major League Baseball Players Ass'n,* 95 F.3d 959 (10th Cir. 1996), affirming the district court's grant of declaratory judgment against

major league baseball on its infringement claim, there was no likelihood of confusion since "no one would mistake MLBPA and its members as anything other than the targets of the parody cards." *Id.* at 967. By definition, a parody plays off of the difference between the original mark and the disputed product in order to create a humorous result and it is this humorous association, not public confusion as to the source of the disputed work or product, which makes a parody successful. *See id.* Nor would Mars dressing up its M&M'S® Character as a baseball player violate Mr. Jeter's right of publicity. As this court explained in *Allen v. National Video, Inc.*, 610 F. Supp. 612 (S.D.N.Y. 1985), merely suggesting "some aspect of a person's public persona" is not actionable so long as the use does not amount to a "portrait or picture" of the plaintiff. *Allen*, 610 F. Supp. at 623. Thus, if Mars's use did no more than suggest a resemblance to Mr. Jeter's public persona by using pin-striped navy and white uniform, sans "Yankees," but with a number '2,' as it did with Burck's likeness, such use is plainly not actionable under section 51 of the Civil Rights Law.

Consequently, under the *Polaroid* analysis, not only has Mars adequately pled its affirmative defense of parody and fair use, on the facts alleged by Burck, Mars's M&M'S® Cowboy Characters are parodies as a matter of law and judgment should be entered in Mars's favor on all claims.

### b.    First Amendment Balancing Approach to Trademark Parody Cases

A minority of courts in this Circuit have analyzed trademark parody cases by first evaluating the First Amendment interests at stake in the defendant's work and then applying the *Polaroid* factors to determine whether the defendant's use is likely to cause consumer confusion. Courts taking this approach recognize that although commercial speech is entitled to lesser First Amendment protection than non-commercial speech, even commercial actors have a First

Amendment right to comment on a trademark owner.  Thus, even in a commercial context, a

defendant's use will be deemed a parody if the following conditions are met: (1) the defendant's

use comments on the trademark owner; and (2) the defendant has not used the parody *as an

indicator of source* for the defendant's product.

This approach was well summarized by the court in *Yankee Publishing, Inc. v. News

America Publishing, Inc.*, 809 F. Supp. 267, 276 (S.D.N.Y. 1992):

> [T]he First Amendment confers a measure of protection for the unauthorized use
> of trademarks when that use is a part of the expression of a communicative
> message.  … When another's trademark (or a confusingly similar mark) is used
> without permission *for the purpose of source identification*, the trademark law
> generally prevails over the First Amendment. . . .  However, when unauthorized
> use of another's mark is *part of a communicative message and not a source
> identifier*, the First Amendment is implicated in opposition to the trademark right.
> In recognition of this conflict, the Second Circuit has construed the Lanham Act
> narrowly when the unauthorized use of the trademark is for the purpose of a
> communicative message. . . .

*Id*. at 275-76 (second emphasis added ); *see also Tommy Hilfiger Licensing*, *Inc.*, 221 F. Supp.

2d at 414 (S.D.N.Y. 2002) ("Cases finding that First Amendment interests prevail involve

nontrademark uses of [a] mark—that is, where *the trademark is not being used to indicate the

source or origin of consumer products*, but rather is being used only to comment upon and, in the

case of parody, to ridicule, the trademark owner.") (Emphasis added).  In conducting this review

the courts "allow[] greater latitude for works such as parodies, in which expression, and not

commercial exploitation of another's trademark, is the primary intent, and in which there is a

need to evoke the original work being parodied."  *Tommy Hilfiger Licensing*, 221 F. Supp. 2d at

414-15 (citation omitted).

Under this approach, Mars's M&M'S® Cowboy Characters are parodies as a matter of

law because they comment on the trademark owner, Burck, and in full context on New York City

as a whole, and because they do not function as indicators of source for Mars's goods.  Contrary

to Burck's assertion, Mars's M&M'S® Cowboy Characters do in fact comment on Burck.  By
dressing its M&M'S® Characters in attire that imitates notable New York Characters, including
Burck's Naked Cowboy, and  by having them act in humorous ways in their various attires, Mars
reminds consumers to see the humor in these familiar New York characters.  That is all that is
required of a trademark parody.  As explained by this Court in *Tommy Hilfiger Licensing*,
"[t]rademark parodies … do convey a message.  The message may be simply that business and
product images need not always be taken too seriously; a trademark parody reminds us that we
are free to laugh at the images and associations linked with the mark." *Tommy Hilfiger
Licensing*, 221 F. Supp. 2d at 415 (quoting *L.L. Bean, Inc. v. Drake Publishers, Inc.*, 811 F.2d
26, 34 (1st Cir. 1987)).  Thus, Mars's M&M'S® Cowboy Characters sufficiently comment about
Burck for purposes of a trademark parody.  *See Cliffs Notes, Inc. v. Bantam Doubleday Dell
Publ'g Group, Inc.*, 886 F.2d 490, 495 (2d Cir. 1989) ("parody may be sophisticated as well as
slapstick"); *L.L. Bean, Inc.*, 811 F.2d at 34 ("[d]enying parodists the opportunity to poke fun at
symbols and names which have become woven into the fabric of our daily life, would constitute
a serious curtailment of a protected form of expression").   The Naked Cowboy, by his own
admission,  is "a fixture of New York City culture, as well as one of the top tourist attractions for
visitors to Times Square." (Compl. ¶ 7.)

Second, Mars does not use the M&M'S® Cowboy Characters as an indicator of source for
Mars's goods.  Quite the opposite, the appearance of Burck's "trademarked get-up" serves only
as a source of humor in Mars's video and mural—expressive works designed primarily to
entertain viewers.  Indeed, the images that serve as indicators of source for Mars in the works at
issue are the famous M&M'S® Characters, with whom consumers have a long and loyal
association.

Mars's use is plainly distinguishable from the case of *Harley Davidson, Inc. v. Grottanelli*, 164 F.3d 806 (2d Cir. 1999), which Burck mistakenly relies upon.  In *Grottanelli*, the plaintiff motorcycle manufacturer Harley Davidson sued the defendant Grottanelli for trademark infringement when Grottanelli adopted a "bar-and-shield" logo for his motorcycle repair business that was highly similar to Harley Davidson's bar-and-shield logo.  *Id*. at 809.  Grottanelli argued that his use should be protected as parody.  *Id*. at 812.  The court held that Grottanelli's use could not constitute parody, as a matter of law, because Grottanelli was using the parody *as a trademark* for his own competing motorcycle business.  *See id*. at 813 ("In this context, parodic use is sharply limited.").  The court also reasoned that Grottanelli's use could not be parody because it "makes no comment on Harley's mark."  *Id*.

Likewise, other decisions have found infringement, not parody, where a defendant used the plaintiff's mark, or a confusingly similar mark, *as a trademark* to sell the defendant's own products, rather than to comment on the plaintiff.  *See Nabisco Brands, Inc. v. Kaye*, 760 F. Supp. 25, 28 (D. Conn. 1991) (finding defendant's use of mark "A.2" for meat sauce infringed plaintiff's "A.1" mark for steak sauce); *Gucci Shops, Inc. v. R.H. Macy & Co.*, 446 F. Supp. 838, 840 (S.D.N.Y. 1977) (defendant's use of mark "GUCCHI GOO" for diaper bags infringed plaintiff's GUCCI mark for handbags); *Grey v. Campbell Soup Co.*, 650 F. Supp. 1166, 1173-75 (C.D. Cal. 1986) (DOGIVA dog biscuits held to infringe GODIVA chocolates), *aff'd*, 830 F.2d 197 (9th Cir. 1987).

Here, as noted above, unlike the defendants in *Grottanelli* and the other foregoing cases, Mars did not use Burck's "trademarked get-up" as a trademark to sell competing products.  Quite the opposite, Mars used Burck's "trademarked get-up" as part of an expressive work that parodies Burck and numerous other familiar New York characters and experiences.  The purpose

14

of Mars's work is to entertain consumers and to poke fun at the New York characters that

consumers recognize as part of their daily lives.  To communicate its humorous message with

respect to Burck, Mars dressed its famous M&M'S® Characters in cowboy attire.  In that context,

the cowboy attire does not function as a trademark for Mars's products, but instead serves to

"conjure up" just enough of Burck's alleged trademark for consumers to recognize the target of

the parody, while at the same time making "obvious changes to the marks that constitute the

joke," namely, the depiction of the cowboy attire on the bodies of animated M&M'S®

Characters, rather than on Burck himself.  *See Tommy Hilfiger Licensing, Inc.*, 221 F. Supp. 2d

at 416.  Indeed, in Mars's parody, it is the M&M'S® Characters, with whom consumers have a

long and loyal association, and not Burck's "trademarked get-up," that serves a trademark

function.

    Thus, because Mars is using the cowboy attire not as an indicator of source for Mars's

products, but rather as part of an expressive work to humorously comment on familiar New York

characters, including Burck, Mars's use is a parody as a matter of law.

### 2.    The Parody Doctrine is Not Limited to Situations Where the Defendant is Selling "Novelty Products."

    Burck argues that the parody defense is only valid where the parody is embodied in the

defendant's product itself, i.e., where the defendant is selling novelty products.  This is not the

law.  The nature of a defendant's goods is simply another factor considered by courts when

conducting the *Polaroid* analysis.  Specifically, the fact that a defendant's goods are novelty

products often strengthens the defendant's parody, because the outrageousness of the defendant's

products dispels any possibility that consumers would think the defendant's products are in fact

authorized by the plaintiff.  *See, e.g., Am. Express Co. v. Vibra Approved Labs. Corp.*, No. 87

CIV 8840 (CSH), 1989 WL 39679, at *5-6 (S.D.N.Y. Apr. 19, 1989) (replica of American

Express card containing condom and phrase "DON'T LEAVE HOME WITHOUT IT" deemed a parody).

However, it is not *required* that a defendant's goods be novelty products in order to constitute parody, and numerous courts have found parody, not infringement, even where the defendant used parody to sell ordinary consumer goods, such as beer, jeans, and casino gambling services.  *See, e.g.*, *New York Stock Exch., Inc. v. New York, New York Hotel, LLC*, 293 F.3d 550, 553-55 (2d Cir. 2002) (use of parody to promote casino gambling services held non-infringing); *Universal City Studios, Inc. v. Nintendo Co.*, 746 F.2d 112, 116 (2d Cir. 1984) (use of parody to sell video game held non-infringing); *Hormel Foods Corp. v. Jim Henson Prods., Inc.*, 73 F.3d 497, 503-04 (2d Cir. 1996) (use of parody to sell dolls and other merchandise held non-infringing); *Eveready Battery Co. v. Adolph Coors, Inc.*, 765 F. Supp. 440, 450 (N.D. Ill. 1991) (use of parody to sell beer held non-infringing); *Jordache Enters., Inc.  v. Hogg Wyld, Ltd.*, 828 F.2d 1482, 1485-86 (10th Cir. 1987) (use of parody to sell jeans held non-infringing).

The rationale in those cases was that obvious differences between the parties' marks and goods would clearly convey to consumers that the defendant's use was a parody, and thus would not cause consumer confusion.  *See, e.g.*, *Eveready Battery Co.*, 765 F. Supp. at 450 (finding parody, not infringement, because "the unmistakable *differences* between the Energizer Bunny and Leslie Nielsen in modified rabbit attire arguably generate much of the humor in the Coors parody" and prevent consumer confusion).[7]

---

[7]     *See also Hormel Foods Corp.*, 73 F.3d at 503-04 (despite fact that defendant used parody to sell merchandise—namely, stuffed animals—rather than novelty products, the use was a parody and not infringing because the visual dissimilarities between defendant's "Spa'am" mark and plaintiff's SPAM mark, and the "parodic context in which the name 'Spa'am' appears will distinguish the marks in the consumer's mind"); *Universal City Studios, Inc.*, 746 F.2d at 116 (use in a video game of "Donkey Kong" character that was similar to plaintiff's "King Kong" character was a permissible parody, not infringement, because "the fact that Donkey Kong so

The same conclusion is warranted here. Just as in *Eveready* where the defendant's use of Leslie Nielsen in a bunny suit was an obvious parody of the Energizer Bunny, so too is Mars's use of its M&M'S® Characters in an adaptation of Burck's "trademarked get-up." Indeed, Mars's modification of Burck's "trademarked get-up" "reinforce[s] the imitative, yet comedic scheme inherent in a humorous takeoff" and is a classic trademark parody. *Tommy Hilfiger Licensing, Inc.*, 221 F. Supp. 2d at 417.

Burck's reliance on *Tin Pan Apple, Inc. v. Miller Brewing Co.*, 737 F. Supp. 826 (S.D.N.Y. 1990) is misplaced as it ignores the difference between copyright and trademark law. Ignoring the significant differences between the two, Burck argues that under *Tin Pan Apple*, where a parody is used to sell an unrelated product, "it cannot constitute fair use." (Mot. 10.) In *Tin Pan Apple*, the plaintiffs—on behalf of the rap group the "Fat Boys," sued the defendants, including Miller Brewing Co., for producing a commercial that used music that sounded like Fat Boys' recordings, and actors who looked like and performed like the Fat Boys. The defendants filed a 12(b)(6) motion to dismiss all claims, arguing among other things that the defendants' use of the Fat Boys look-alikes was protected under the parody doctrine.

The bulk of the *Tin Pan Apple* court's analysis centers on the plaintiff's *copyright* claim. In this regard, the court noted that for parody to be viable in a copyright context, it must be a "fair use" as defined under Section 107 of the Copyright Act. *Id*. at 830. One of the factors to be considered in a copyright fair use analysis is whether the defendant's work is of a commercial nature. *Id*. at 832. Thus, the court reasoned, the fact that the defendant's work had a "commercial purpose [is] a factor militating against fair use." *Id*. The *Tin Pan Apple* court

---

obviously parodies the King Kong theme strongly contributes to dispelling confusion on the part of consumers"); *Jordache Enters.*, 828 F.2d at 1485 (defendant's use of "striking, brightly colored and far from subtle" pig design for its "Lardashe" jeans was an obvious parody of plaintiff's JORDACHE jeans, and would not cause consumer confusion).

therefore held that because the defendant's work was "entirely for profit," this factor weighed against the defendant in the fair use analysis and, ultimately, the defendant could not demonstrate that its work was a "fair use" for purposes of seeking to dismiss the plaintiff's claim. *Id*. at 833. Without any separate analysis, the court also denied the defendant's motion to dismiss with respect to the plaintiff's trademark claim. *Id*. at 834.

Significantly, the *Tin Pan Apple* court *did not* hold that a parody used in a commercial ad could never constitute "fair use" under either copyright or trademark infringement analysis. Indeed, as noted above, numerous decisions have upheld exactly such commercial uses of parody to promote a defendant's product. *See, e.g., New York Stock Exch., Inc.*, 293 F.3d at 553-54 (holding that defendant's use of comical adaptations of plaintiff's marks in advertisements to promote defendant's casino gaming services was a parody, and not infringement). Moreover, unlike the defendant in *Tin Pan Apple*, Mars's M&M'S® Cowboy Characters were not made to appear to actually be Burck, *i.e.*, Mars did not employ a look alike. Nor was Mars's parody of Burck used in a commercial designed solely to promote a product. Instead, Mars's parody was displayed in a video and mural designed to entertain viewers by parodying numerous familiar New York characters. Further, the procedural posture of the *Tin Pan Apple* decision was quite different than in the present Motion. The *Tin Pan Apple* court did not strike the defendant's parody defense, nor did it enter judgment for the plaintiff, but held only that as pled, the plaintiffs had stated a viable claim for infringement under the Lanham Act. *Tin Pan Apple*, 737 F. Supp. at 833-34.

Likewise, Burck's reliance on *D.C. Comics, Inc. v. Crazy Eddie, Inc.*, 205 U.S.P.Q. 1177 (S.D.N.Y. 1977) is misplaced. In *D.C. Comics*, the court analyzed only the plaintiff's copyright claim, and held that the because the defendant's commercial represented a "detailed copying of

plaintiff's trailers," and used it solely for "personal profit" it did not qualify as fair use under the Copyright Act. *Id.* at 1178. The facts here could not be more different. First, this is a trademark, not copyright action. Second, Mars's parody merely "conjures up" enough of Burck's trademark to make the target of its parody clear, while simultaneously making obvious changes to Burck's trademarked likeness to avoid any possibility of consumer confusion. Third, Mars used the parody not "solely for personal profit" but in the context of an expressive work designed to entertain viewers. *D.C. Comics* therefore is wholly inapposite.

Similarly, *Steinberg v. Columbia Pictures Industries, Inc.*, 663 F. Supp. 706 (S.D.N.Y. 1987)—cited by Burck—is irrelevant to the case at bar. In *Steinberg*, the plaintiff again asserted only a copyright claim, and alleged that the defendant's copying of the plaintiff's iconic drawing of New York City and use of it in a movie poster to promote the defendant's movie constituted copyright infringement. *Steinberg*, 663 F. Supp. at 708. In analyzing the fair use factors, the court held that the defendant's work could not constitute fair use because the work did not parody the plaintiff's illustration at all, but instead merely copied the plaintiff's work in order to promote the defendant's movie. *Id.* at 715. The facts here are patently different. Unlike the *Steinberg* defendant's movie poster, Mars's expressive work *does in fact* comment on Burck. As noted above, Mars's M&M'S® Cowboy Characters convey the humorous message that familiar New York characters such as Burck, or the fellow stealing your cab, should be taken lightly, and that consumers should see the humor in familiar New York characters and experiences. Hence the conclusion of the video: "I ♥ NY," with the Red M&M'S® Character standing in the place of

the heart.  Accordingly, because Mars's work conveys an expressive message, Burck's reliance on *Steinberg* is misplaced.[8]

### C.    Burck Cannot Demonstrate that Parody—as a Matter of Law—Is Not a Viable Defense to His Right of Publicity Claim.

Burck argues that parody is not a viable defense to a plaintiff's right of publicity claim under section 51 of the New York Civil Rights Law.  The only case Burck cites for this proposition, *Allen v. National Video, Inc.*, 610 F. Supp. 612 (S.D.N.Y. 1985), does not support his assertion.  In fact, *Allen* did not involve a parody claim at all, and held that the plaintiff could not sustain his right of publicity claim on the ground that the defendant's use of a celebrity look-alike was not, as a matter of law, a "portrait or picture" of the plaintiff.  *Id*. at 624.  *Allen* therefore does not support Burck's position, and Burck has pointed to no decision—nor could he—holding that a parody defense is not viable as a matter of law against a right of publicity claim under New York law.

Moreover, the case law suggests that a defendant's parodic use is indeed a valid defense to a right of publicity.  Indeed, in the factually similar case of *World Wrestling Fed'n v. Big Dog Holdings, Inc.*, 280 F. Supp. 2d 413, 434 (W.D. Pa. 2003), the court entered summary judgment for defendants who used "dogified" images of professional wrestlers on defendant's t-shirts.  The court noted that the images used by the defendant were not "literal depictions" but were instead

---

[8]    Burck's reliance on *Tommy Hilfiger Licensing, Inc.* 221 F. Supp. 2d at 414 also is unavailing.  The court in *Hilfiger* held that the defendant's use of the name "Timmy Holedigger" for pet perfume was an obvious "pun" or comical adaptation on the plaintiff's TOMMY HILFIGER marks.  Although the court noted that pet perfume, as a novelty product, helped clarify the fact that the defendant's use was parody, the court did not hold that *only* defendants selling novelty products can avail themselves of the parody defense.  Indeed, as noted above, many decisions have held otherwise, and have found a defendant's use to be parody even where it sold ordinary consumer products.  *See, e.g., New York Stock Exch., Inc.*, 293 F.3d 553-55 (defendant's use of comical adaptations of plaintiff's marks in connection with casino gambling services was a parody, not infringement).

caricatures.  *Id*. at 445.  In finding the defendant's images to be parodies, rather than violations of the plaintiffs' rights of publicity, the court reasoned that "Big Dog's use of dogs to poke fun at celebrities and societal icons is an important form of entertainment and expressive commentary that deserves First Amendment protection."  *Id*.  The same conclusion is warranted here.  By dressing the famous M&M'S® Characters in cowboy attire, Mars has, at most, *suggested* aspects of Burck's public persona.  In addition, Burck, like the WWE celebrities in *Big Dog*, claims to have attained "celebrity status" and thus is a "prime target of satire and parody" of the type that Mars has utilized.  *Id*.

Consequently, Burck cannot show that parody is not viable—as a matter of law—as a defense to Burck's right of publicity claim.

## **CONCLUSION**

For these reasons Burck's motion to strike Mars's affirmative defenses of fair use and parody should be denied.

Dated:  May 16, 2008                  Respectfully submitted,

                                      **ARENT FOX LLP**


                                      _____/s/_____
                                      Leslie K. Mitchell, N.Y. Bar No. LM2811
                                      Joseph R. Price (*admitted pro hac vice*)
                                      Ross Q. Panko
                                      **ARENT FOX LLP**
                                      1675 Broadway
                                      New York, New York 10019
                                      Telephone: (212) 484-3900
                                      Facsimile: (212) 484-3990
                                      Price.joseph@arentfox.com

                                      *Counsel for Defendants*