# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ROBERT BURCK t/a THE NAKED COWBOY,<br>                    Plaintiff,<br>        v.<br><br>MARS, INCORPORATED and CHUTE GERDEMAN, INC.<br>                    Defendants. | NO.  08-1330<br><br>Judge Denny Chin |

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT CHUTE GERDEMAN, INC.'S MOTION TO DISMISS AND DEFENDANT MARS, INCORPORATED'S <u>MOTION FOR JUDGMENT ON THE PLEADINGS</u>

## TABLE OF CONTENTS

I.      INTRODUCTION................................................................................1

II.     FACTS..........................................................................................2

III.    ARGUMENT....................................................................................4

        A.      Legal Standard....................................................................4

        B.      Plaintiff Has Stated a Claim for False Endorsement
                Under § 43(a) of the Lanham Act..............................................5

        C.      Plaintiff Has Stated a Claim for Violation of His
                Right of Publicity................................................................12

                1.      Section 51 Has Been Liberally Construed..........................13

                2.      The Purpose of the Right of Publicity Is to Protect
                        Celebrities from Commercial Exploitation..........................17

IV.     CONCLUSION................................................................................22

# I.    INTRODUCTION

Defendants Mars, Incorporated ("Mars") and Chute Gerdeman, Inc. ("Chute Gerdeman") argue that the Plaintiff has failed to state a claim under either § 43(a) of the Lanham Act, or § 51 of the New York Civil Rights Law.  Regarding the § 43(a) claim, Plaintiff has adequately pled the elements of false endorsement, a well-settled cause of action which provides celebrities with a right to recover for the unauthorized use of their images, names or personas in connection with the marketing of goods or services.  The Complaint sets forth the requisite allegations of celebrity status and likely consumer confusion.  While Defendants stake their bid for a dismissal on the parody doctrine, the case law in this jurisdiction precludes reliance on same where the parody is not the product itself, but is instead used to endorse an unrelated product.  Further, even if the parody defense could be asserted in this context, it presents questions which are well within the province of a fact-finder.

Regarding the § 51—or "right of publicity"—claim, Defendants argue that the protections of the statute only extend to actual pictures of the complaining celebrity.  As discussed below, however, the courts have liberally construed the scope of § 51 on a consistent basis, in recognition of the fact that its purpose is to afford protection from the commercial exploitation of a celebrity's hard-earned good-will.  Defendants are unable to point to any case law which precludes a § 51 claim under the facts as alleged in the Complaint.  For these reasons, and in view of the deferential standard applied to Rule 12(b)(6) motions, Plaintiff has stated a viable right of publicity claim.

## II.    **FACTS**

For the past ten years, the Plaintiff herein has made his living in Times Square performing as the Naked Cowboy.  Complaint, ¶ 5.  As a musician and street entertainer, the Naked Cowboy has performed live in the heart of Times Square for hundreds of thousands of people.  Id. at ¶ 6.  The Naked Cowboy performs at all times in his trademarked and unmistakable costume consisting of a white cowboy hat, a pair of white cowboy boots, an acoustic guitar, and—of course—his signature white briefs.  Id.  The Naked Cowboy's street performances have become a fixture of the New York City landscape, and have been cited by many sources as one of the City's top ten tourist attractions.  Id.  As a result of a combination of hard work and marketing savvy, the Naked Cowboy has developed himself into a well-recognized celebrity persona in New York and beyond.  Id. at ¶ 20.

The Naked Cowboy has capitalized on his celebrity status by appearing on television, on radio, and in a variety of other live settings including Mardi Gras in New Orleans.  Id. at ¶¶ 10-19.  He has appeared over the years in music videos, game shows, talent shows, reality shows, and even a video game.  Id.  He has also developed product endorsement relationships with various companies and has licensed the use of his name and image for the purpose of advertising on multiple occasions.  Id. at ¶¶ 22-24.  In February 2007, he was featured in a Super Bowl commercial, which is widely regarded as the pinnacle of advertising exposure.  Id. at ¶ 23.

Apparently recognizing the commercial value of the Naked Cowboy persona, Mars ran a series of advertisements featuring animated M&M candy characters adorned in the Naked Cowboy's inimitable attire—white cowboy hat, white cowboy boots,

acoustic guitar and white underwear briefs. Id. at ¶¶ 25-26. One of these advertisements was displayed on an oversized video billboard in Times Square, and ran on a continuous loop every few minutes from April 2007 through January 2008. Id. at ¶¶ 26, 29. The other advertisement was a pictorial version of the guitar-toting M&M which was likewise dressed up as the Naked Cowboy, and which bore the designation "Peanut Cowboy" on its cowboy hat. Id. at ¶ 30.

As alleged in the Complaint, the offending advertisements were created by co-defendant, Chute Gerdeman. In creating and publishing these ads, the Defendants' obvious purpose was to sell Mars' candy through the use of the Naked Cowboy's trademarked persona and celebrity good will. Id. at ¶ 25. Neither Mars nor Chute Gerdeman has compensated the Naked Cowboy for the use of his likeness in these commercial advertisements, and neither Defendant sought his permission to use same. Id.

The Naked Cowboy's Complaint sets forth claims for (a) trademark infringement on the theory of false endorsement; and (b) a violation of his New York statutory right of publicity. Id. at ¶¶ 40-51. In its Answer, Mars acknowledges that it ran the foregoing advertisements and that it featured an M&M dressed in the above-described "cowboy attire." Answer, ¶¶ 26, 30. Mars further admits that it did not compensate The Naked Cowboy for its appropriation of his persona, nor did Mars obtain any licenses or rights for same. Id. at ¶ 25. Mars does, however, set forth two affirmative defenses which are the subject of this motion: parody and fair use. Id. at "Eight Affirmative Defense" and "Tenth Affirmative Defense." Chute Gerdeman did not file an answer, but instead filed the present Motion to Dismiss on the grounds that the ads qualify as fair use under the

doctrine of parody, and that they do not contain a "likeness" of the Naked Cowboy

pursuant to § 51 of New York's Civil Rights Law.  In conjunction therewith, Mars seeks

judgment based on the pleadings in the event the court dismisses both of Plaintiff's

claims.

## III.    ARGUMENT

### A.    Legal Standard

A complaint may not be dismissed under Rule 12(b)(6) "unless it appears beyond

doubt, even when the complaint is liberally construed, that the plaintiff can prove no set

of facts which would entitle him to relief." Allaire Corp. v. Okumus, 433 F.3d 248, 250

(2d Cir. 2006) (internal citation omitted).  Stated otherwise, "a complaint should not be

dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can

prove no set of facts in support of his claim which would entitle him to relief." Shakur v.

Selsky, 391 F.3d 106, 112 (2d Cir. 2004) (internal citation omitted).

Recently, this Court observed that "[o]n a motion to dismiss…, the court must

accept the factual allegations of the pleading as true and draw all reasonable inferences in

favor of the party opposing the motion." Telenor East Invest AS v. Altimo Holdings &

Investments, Ltd., Fed. Sec. L. Rep. (CCH) P94,615, 2008 U.S. Dist. LEXIS 23458 at

*16, Civil Action No. 07-4829 (DC) (S.D.N.Y. Mar. 25, 2008) (citing Bernheim v. Litt,

79 F.3d 318, 321 (2d Cir. 1996)).  The Court further noted that in view of the decision in

Bell Atl. Corp. v. Twombly, 127 S. Ct. 1955, 1965 (2007), "[t]he question is whether the

pleading alleges 'enough facts to state a claim for relief that is plausible on its face.'" Id.

(quoting Patane v. Clark, 508 F.3d 106, 111-12 (2d Cir. 2007)).

**B.    Plaintiff Has Stated a Claim for False Endorsement Under § 43(a)**

To state a claim for false endorsement under § 43(a) of the Lanham Act, a plaintiff must allege that consumers are likely to be confused as to whether the plaintiff has endorsed or sponsored the Defendants' goods or services. Rostropovich v. Koch Int'l Corp., 34 U.S.P.Q.2d (BNA) 1609, 1995 U.S. Dist. LEXIS 2785, *10 (S.D.N.Y. 1995) ("Section § 43(a) of the Lanham Act prohibits the marketing of a product in a manner that is likely to mislead consumers into believing the product is sponsored or approved by another person when it is not"); Star Indus. v. Bacardi & Co., 412 F.3d 373, 384 (2d Cir. 2005) ("the public's belief that the mark's owner sponsored or otherwise approved the use of the trademark satisfies the confusion requirement"); Wendt v. Host International, Inc., 125 F.3d 806, 812 (9th Cir. 1997) (" a false endorsement claim based on the unauthorized use of a celebrity's identity alleges the misuses of a trademark, i.e., a symbol or device such as a visual likeness... or other uniquely distinguishing characteristic, which is likely to confuse consumers as to the plaintiff's sponsorship or approval of the product").

In this case, Defendants argue that Plaintiff has failed to plead a claim for false endorsement under the Lanham Act because the advertisements in question constitute parodies. Defendants assert that because the ads are parodies, no consumers could conceivably be confused "regarding the source, sponsorship or approval of the images." (Defs. Br., p. 3). This position is flawed for several reasons. First and foremost, as discussed in Plaintiff's Motion to Strike Mars' Affirmative Defenses of parody and fair use, the offending images cannot constitute parody *as a matter of law* because they are used in connection with the marketing of an unrelated product. Thus, far from entitling

Defendants to a dismissal at this stage, the parody defense itself should be dismissed and stricken. In lieu of restating the arguments as to why the images are not parodies as a matter of law, Plaintiff directs the Court's attention to its Brief in support of the Motion to Strike.[1]

Perhaps recognizing the limited applicability of the parody defense, Defendants now focus their argument on their assertion that "there is simply no basis to find that the M&M'S Characters allegedly attired as the Naked Cowboy would be confused by consumers as having been produced, sponsored or approved by Burck." (Defs. Br., p. 2). The problem with this position is two-fold. First, the allegation is not just that consumers may be confused as to whether the Naked Cowboy produced, sponsored or approved the "images" or the "M&M'S Characters," but that consumers may be confused as to whether the Naked Cowboy has sponsored or approved of the product being advertised— i.e., the M&M candy. Second, and most importantly, the question of whether consumers may or may not perceive an endorsement as a result of the Defendants' use of the Naked Cowboy in their ads is factual question which can only be resolved following discovery.

Simply stated, Defendants ignore the well-pled allegations of the Complaint and presume that no person could possibly have been led to believe that the Naked Cowboy endorses or approved of M&M's candy. In so doing, Defendants resort to matters that are outside of Plaintiff's pleading, including a lengthy description of images appearing in

---

[1] To summarize, the Motion to Strike the parody and fair use defenses is premised on the distinction between commercial parodies which constitute products themselves, and parodies which are used merely to promote an unrelated product. While some courts have recognized that a parody qualifying as an actual product could potentially (though not often) be a fair use, the courts of this Circuit have uniformly rejected the defense of parody where the alleged parody is used, is in this case, to advertise something else. Tin Pan Apple, Inc. v. Miller Brewing co., Inc., 737 F. Supp. 826 (S.D.N.Y. 1990); D.C. Comics, Inc. v. Crazy Eddie, Inc., 205 U.S.P.Q. (BNA) 1177 (S.D.N.Y. 1979); see also Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd., 604 F.2d 200, 205 (2d Cir. 1979) (dressing up of woman in attire resembling Dallas Cowboy cheerleader uniforms—consisting of white boots, white shorts and star-studded vest—for purpose of promoting "Debbie Does Dallas" film was not a parody as a matter of law).

other M&M's advertisements. (Defs. Br., pp. 2-3). Even if the Court were to consider these impertinent matters, it would still be improper to assume, at this stage, that the Naked Cowboy will be unable to demonstrate the requisite likelihood of confusion. He has pled that he is a celebrity and that viewers are likely to perceive that he endorses or approves of M&M's candy. Compl., ¶¶ 41-43. This is sufficient to state a claim for false endorsement under § 43(a).

The balance of the Defendants' discussion of the § 43(a) claim focuses on the "Polaroid" factors, which some courts (but not all) have applied to determine whether there is sufficient evidence of a misperception of endorsement. As Defendants themselves acknowledge, the application of these factors "plainly involves factual inquiries." (Defs. Br., p. 11). It should go without saying that courts do not undertake such fact-intensive inquiries on a Rule 12(b)(6) Motion given the absence of any factual record to make this factual inquiry. Given that this is a notice pleading jurisdiction, is doubtful that any of these discrete sub-factors (of the overarching "likelihood of confusion" question) need to pled, let alone established, at this stage. Indeed, Defendants fail to point to a single decision where a § 43(a) claim suffered a dismissal for failure to plead each and every "Polaroid" factor.

To the extent that Defendants are trying to argue that Plaintiff has failed to adequately *allege* "likelihood of confusion," it should be noted that their "application" of the "Polaroid" factors treats Plaintiff's celebrity false endorsement claim as if it were a claim for confusion of source as between two parties competing within the same market. For instance, in discussing the factors pertaining to the "quality of defendant's product" and "the likelihood of bridging the gap," Defendants fail to recognize that such

considerations bear no relevance to the narrow question of whether people might infer an endorsement from the Defendants' use of the Naked Cowboy's celebrity persona in connection with marketing M&M's candy. These factors are obviously designed to be applied in a case where the issue is whether the public may be confused as to the source of goods or services, as opposed to whether there is a perception of celebrity endorsement. Plaintiff is aware of no decision which subjected a celebrity false endorsement claim to these impertinent considerations. *See e.g.* Dallas Cowboys Cheerleaders Inc. v. Pussycat Cinema, Ltd., 604 F.2d 200, 205 (2d Cir. 1979) (relying solely upon "strength of mark" and "similarity" factors to uphold a finding of false endorsement); Rostropovich, *supra*, 1995 U.S. Dist. LEXIS 2785 at *10 (denying summary judgment to defendant on false endorsement claim without resort to any "Polaroid" factors); Allen v. National Video, Inc., 610 F. Supp. 612 (S.D.N.Y. 1985) (awarding summary judgment to plaintiff actor Woody Allen for use of "look-a-like" model in ad for video rental chain in without resort to "quality of product" and "bridging the gap" factors); Tin Pan Apple, Inc. v. Miller Brewing co., Inc., 737 F. Supp. 826 (S.D.N.Y. 1990) (denying summary judgment to defendant on false endorsement claim pursuant to same analysis used in Allen); Geisel v. Poynter Products, Inc., 283 F. Supp. 261, 267 (S.D.N.Y. 1965) (granting plaintiff "Dr. Seuss" preliminary injunction on false endorsement claim without consideration of any "Polaroid" factors).

Turning to those "likelihood of confusion" factors which arguably are applicable here (and bearing in mind this a Rule 12(b)(6) Motion), Plaintiff submits that none of them—whether taken individually or as a whole—serves to preclude his claim. Regarding "the strength of Plaintiff's mark," the controlling question is whether the

Plaintiff is "well-known to the public" and "has built up a considerable investment in his unique, positive public image." Allen, 610 F. Supp. at 627. The Naked Cowboy has set forth numerous allegations concerning his celebrity status as well as the efforts he has undertaken to develop his unique public image. Compl., ¶¶ 5-20. Further, an acknowledgment of intentional copying—part and parcel of the parody defense—is "persuasive, if not conclusive evidence of consumer recognition." Centaur Comm., Ltd. v. A/S/M Comm., Inc., 830 F.2d 1217, 1224 (2d Cir. 1987). Finally, Defendants' argument that the popularity of the Naked Cowboy mark actually supports its parody defense is flawed because, as discussed in Plaintiff's pending Motion to Strike, the offending ads do not qualify as valid parodies.

Regarding the "similarity of marks" factor, Defendants again rely upon their parody defense, which is either inapplicable as a matter of law (see Plaintiff's Motion to Strike) or otherwise rife with factual issues pertaining to, *inter alia*, the degree to which the offending cartoons borrowed from the Naked Cowboy's name and likeness. Allen, 610 F. Supp. at 627. While the Naked Cowboy is displayed as an M&M's character, the images appropriated just about every identifiable characteristic of the Naked Cowboy: his name, his guitar, his white cowboy hat, his white cowboy boots, and his "NYC"- emblazoned underwear briefs. The question of whether this extent of copying amounts to "similarity" cannot be resolved at this stage, nor would a resolution of same be dispositive of overarching question, which is whether viewers may perceive an endorsement. *See* D.C. Comics, Inc. v. Crazy Eddie, Inc., 205 U.S.P.Q. (BNA) 1177 (S.D.N.Y. 1979) (electronics retailer's commercial use of phrase "Look!... It's a bird!... It's a plane... It's Crazy Eddie" was, by itself, sufficiently similar to Superman

catchphrase to warrant preliminary injunctive relief in favor of plaintiff); Waits v. Frito-Lay, Inc., 978 F.2d 1093, 1097 (9th Cir. 1992) (affirming judgment for plaintiff musician under § 43 on account of defendant's use of an actor mimicking his unique "gravelly singing style" in television ad for snack foods).[2]

As for the "proximity of products" factor, it is first noted that there has been no celebrity false endorsement claim dismissed by any court on the ground that the parties' "products" were not similar. Given that many celebrities do not have "products" other than their celebrity personas, Plaintiff submits that this factor cannot sensibly be applied in such a case. One case that did consider this factor is Allen, which involved a Woody Allen "look-a-like" who appeared in ads for a video rental store. The court noted that the audience at which the ad was aimed—movie watchers—could be viewed as similar to the audience who knew Woody Allen. 610 F. Supp. at 628. In this case, the audiences also overlap given that anyone visiting Times Square who saw the advertisements is also likely to have been entertained by the Naked Cowboy.

Defendants next turn to the matter of "actual confusion," and argue that Plaintiff failed to allege same. While this appears to mark the first recognition by Defendants of the Rule 12(b)(6) standard, it is well-settled that a plaintiff need not establish, and thus need not allege, actual confusion in order to state a violation under § 43. Allen, 610 F. Supp. at 628. As for the "bad faith" factor, two points are noted. First, although Defendants now lean on their "intent to parody" assertion, Mars, in its Answer, refused to

---

[2] The lead case relied upon by Defendants in this section, Everready Battery Co. v. Adolph Coors, Inc., 765 F. Supp. 440, 450 (N.D. Ill. 1991), does not support their bid for a dismissal given that the Everready Court addressed a motion by the plaintiff therein for a preliminary injunction. Further, the case did not involve a claim by a celebrity for false endorsement, but instead was a dispute between two companies over the use of a trademark in competing television ads. The remaining decisions cited by Defendants (on p. 15 of Defs. Br.) are more parody cases, each of which involved *products* that qualified as parodies, and are thus distinguishable (*see* Pltf. Mot. to Strike Aff. Defs.). Further, as with Everready, none of these cases involved a celebrity false endorsement claim.

admit that the ads were intended to conjure up the Naked Cowboy, averring instead that the animated M&Ms were merely dressed up in "cowboy attire." Answer, ¶¶ 26, 30. Second, a jury could easily find that the Defendants' use of the Naked Cowboy's persona to advertise their candy was done "to capitalize… on plaintiff's good will." Tommy Hilfiger Licensing, Inc., 221 F. Supp. 2d at 419; see also Tin Pan Apple, 737 F. Supp. at 835 ("where a defendant designs an advertisement intentionally to evoke an association with a plaintiff, they must therefore at least have been aware of the risk of consumer confusion, which militates against a finding that their motives were completely innocent"). It may, after all, be learned through discovery that the Defendants contemplated asking for the Naked Cowboy's permission to use his image, or otherwise considered the possibility that viewers of the ads might perceive an endorsement of the candy on his part. In Allen, 610 F. Supp. at 628, the court found bad faith where the defendants created the ad "to evoke an association with plaintiff." For this reason, the court explained, "they must therefore at least have been aware of the risk of consumer confusion." Id.[3]

Finally, Defendants argue that the "sophistication of consumers" factor must be resolved in their favor because there are no allegations pertaining to same. Aside from the fact that, once again, this is a notice-pleading jurisdiction, no court has ever dismissed a false endorsement claim with this factor in view. To the extent it is deemed applicable here, it represents yet another fact-intensive question for a jury.

---

[3] As an example of what discovery might reveal on the issue of bad faith, attached hereto as Exhibit "A" is correspondence from Chute Gerdeman's in-house counsel stating that the agency had "no involvement" with the creation of the offending advertisements, a point belied in Mars' Answer, at ¶¶ 32-33.

**C.**    **Plaintiff Has Stated a Claim for Violation of His Right of Publicity**

Section 51 of the New York Civil Rights Law ("§ 51") prohibits the use of any person's "name, portrait or picture" for "the purpose of trade" without the person's consent. As observed in Ali v. Playgirl, 447 F. Supp. 723, 726 (S.D.N.Y. 1978), the prohibition under § 51 is "not restricted to photographs... but comprises those representations which are recognizable as likenesses of the complaining individual." Id. The offending representation in Ali was a drawing appearing in a magazine ad which, in the court's view, was recognizable as a likeness of legendary boxer Muhammad Ali. Id. at 726-27. The court described the drawing as "a dramatization, an illustration falling somewhere between representational art and cartoon," and opined that the defendants "cannot seriously dispute" the fact that the drawing was at least intended to represent Ali. Id. at 726. In view of these facts, the court granted Ali preliminary injunctive relief and ordered the defendants to immediately cease any further publication or dissemination of the picture. Id. at 731.

In this case, Defendants argue that the offending "Peanut Cowboy" cartoons cannot qualify as a "likeness" of the Naked Cowboy because they do not consist of a picture or portrait of his face or his actual person. Defendants assert that Plaintiff's claim must fail because no one "could conclude that those animated images were *actually a picture of Burck*, nor that the images were 'indistinguishable' from Burck." (Defs. Br., at p. 8) (emphasis in original). This argument, however, is inconsistent with Ali, which held that the cartoon-ish illustration qualified as a picture of Muhammad Ali *despite* the fact that it was neither an actual picture nor a representational portrait of the famous boxer. Further, Defendants point to no case which actually barred a § 51 claim arising

from the commercial use of a cartoon that is unmistakably a depiction of a celebrity persona.

As detailed below, § 51 should be construed to encompass the Defendants' commercial misappropriation of the Naked Cowboy's celebrity persona.  This result is consistent with the liberal construction afforded to § 51 over the years, as well as the long-standing purpose of the right of publicity, which is to protect celebrities from commercial exploitation.

### 1.    Section 51 Has Been Liberally Construed

As noted in Onassis v. Christian Dior—New York, Inc., 472 N.Y.S.2d 254, 258 (N.Y. S. Ct. Co. 1984), the purpose of § 51 is "remedial" and is designed to allow an individual "to be immune from commercial exploitation."  For this reason, the court explained, § 51 has been "liberally construed over the ensuing years."  Id.  Citing to the Ali decision, supra, the Onassis court noted that the term "picture" under § 51 "is not restricted to actual photographs, but comprises any representations which are recognizable as likenesses of the complaining individual."  Id. at 259.  Citing to Webster's Dictionary, the court then observed that the definition of "picture" includes "anything closely resembling or strikingly typifying something else;" while the definition of "portrait" is even broader as it may include "any close likeness of one thing to another."  Id. at 261.  The court even went so far as to state that "the words 'portrait or picture' comprehend a sketch, a cartoon, or a caricature," and stated that the litmus test is whether there is "instant recognition" of the person the ad is intended to depict.  Id. at 262.

In view of the remedial purpose of § 51, the <u>Onassis</u> court decided to extend the reach of the statute to include the use of celebrity "look-alikes" for advertising purposes. In so doing, the court reasoned as follows:

> The essential purpose of the statute must be carried out by giving it a commonsense reading which bars easy evasion. If we truly value the right of privacy in a world of exploitation, where every mark of distinctiveness becomes grist for the mills of publicity, then we must give it more than lip service and grudging recognition. Let the word go forth—there is no free ride. The commercial hitchhiker seeking to travel on the fame of another will have to learn how to pay the fare or stand on his own two feet.

<u>Id.</u>

In the present case, a commonsense reading of the statute reveals that Defendants' use of The Naked Cowboy's persona is no less exploitative than the use of a celebrity look-alike such as a Jackie Onassis impersonator. In both instances, the clear intent—and likely effect—is to convince viewers that the celebrity endorses or is in some way connected to the commercial product being advertised. The critical point is found in the court's stated reason for broadly construing the statutory term, which is to ensure that the law serves its intended purpose of protecting people from having their celebrity good will misappropriated by "commercial hitchhikers" who should, in all fairness, be paying "the fare" for trading upon same. <u>Id.</u> at 162. The court further explained as follows:

> It is the overall impression being made that counts... What difference if a sketch is used instead of a lookalike model in connection with a commercial promotion? The end result is the same—trading on the name or features of another and the unwarranted commercial exploitation of a person who has not consented to be commercially exploited.

<u>Id.</u>

It should also be noted that the defendants in Onassis tried to argue that their use of the Jackie Onassis look-a-like was privileged because it was clearly an attempt at humor. The court rejected this argument and held that, as a matter of law, the element of humor was irrelevant where the use was "solely in connection with promoting the sale of goods." Id. at 263.

In deciding to construe § 51 liberally, the Onassis court relied upon a handful of the earliest decisions which applied § 51. In Loftus v. Greenwich Lithographing Co., 182 N.Y.S. 428, 192 A.D. 251 (App. Div. 1920), the offending image was likewise not an actual picture of the plaintiff, but an advertising poster for a movie called "Shame" which showed a sketch of a female figure in a costume that plaintiff had popularized. Significantly, the illustration was deemed recognizable as the plaintiff not because of any characteristics of the figure's face or person, but *because of the unique costume worn by the figure*. The court explained:

> There is no evidence that this costume was ever upon or worn by any person other than the plaintiff and it is fairly to be inferred from the fact that she so appeared in public that she became well known in that character and would be readily recognized from the photograph and particularly from the costume and pose.

Id. at 252.

Despite finding that the mark of distinctiveness was not the plaintiff's face or actual person, but instead was her unique costume, the court held that the depiction qualified as a likeness of the plaintiff. Id. at 256. The court reasoned that to hold otherwise would "defeat" the purpose of the right of publicity. Id. *See also* Young v. Greneker Studios, Inc., 26 N.Y.S.2d 357 (Sup. Ct. 1941) (extending the definition of portrait or picture to include a manikin or sculpture for which plaintiff was the model, and construing the

words "portrait or picture" as inclusive of any representation of an individual "produced by art"); Binns v. Vitagraph Co., 210 N.Y. 51, 57 (1913) (holding that the use of a picture of another person that is "suggestive" of the plaintiff is prohibited under § 51 because term "picture" includes "any representation of such person"); Tin Pan Apple, Inc. v. Miller Brewing Co., 737 F. Supp. 826, 837 (S.D.N.Y. 1990) ("[t]he essence of what is prohibited [under § 51] is the exploitation of one's *identity* that is conveyed verbally or graphically").

    More recently, in Cohen v. Herbal Concepts, Inc., 63 N.Y.2d 379, (1984), a plaintiff mother sued on behalf of herself and her minor child after their nude pictures were used in an advertisement without her consent. The picture showed their back and right sides, as well as part of the mother's right breast. Neither of their faces, however, was at all visible. Reversing the entry of summary judgment for the defendant, the court held that the "quantity and quality of the identifiable characteristics displayed in the advertisement" was a question for the jury. Id. at 384. In the present case, it is likewise within the province of a jury to weigh the "quantity and quality" of the Naked Cowboy's "identifiable characteristics" that are on display in the offending ads. Indeed, the logic employed by Cohen and Onassis applies with even greater force in this case given that the "Peanut Cowboy" cartoons have appropriated just about every visual and stylistic cue referential to the Naked Cowboy. *See also* Groucho Marx Productions, Inc. v. Playboy Enterprises, Inc., 1977 U.S. Dist. LEXIS 12099 at *6-7, No. 77-cv-1782 (S.D.N.Y. Dec. 30, 1977) (finding a violation of § 51 based on the appropriation of "the indicia of" the plaintiff's "unique 'persona'"); Tin Pan Apple, Inc., *supra*, 737 F. Supp. at 832 ("the essence of what is prohibited, as the statute, the cases, and the dictionary definitions

16

make clear, is the *exploitation of one's identity* as that is conveyed verbally or graphically") (emphasis added).

### 2.    The Purpose of the Right of Publicity Is to Protect Celebrities from Unauthorized Commercial Exploitation

As noted above, Defendants contend that in the absence of a depiction of the Plaintiff's face or person, the right of publicity is not implicated. Not only is this position unsupported by any controlling authority, it relies upon a misapprehension of the purpose of the protections afforded by the right of publicity. Under New York law, the right of publicity, as codified under § 51, serves essentially as a state law analogue to a federal false endorsement claim. In Onassis, 427 N.Y.S.2d at 258, the court explained that the use of a celebrity's likeness in an advertisement is actionable under § 51 not because of the mere exposure of someone's face, because the use of the celebrity's good will "serve[s] as a badge of approval for that commercial product." Emphasizing the goal of prohibiting this type of unwitting product sponsorship, the court further observed that:

> The principle to be distilled from the statute and of the cases construing it is that all persons, of whatever station in life, from the relatively unknown to the world famous, are to be secured from rapacious commercial exploitation.
>
> While the statute may not, by its terms, cover... characteristics or style, it is intended to protect *the essence of the person*, his or her identity or persona from being unwillingly or unknowingly misappropriated for the profit of another.

Id. at 260 (emphasis added).

It cannot be said, particularly at this stage of the proceedings, that Defendants' use of the Naked Cowboy's persona falls outside of the intended reach of this statutory protection. While the Naked Cowboy's face may not appear in the offending ads, it is

beyond any dispute that the purpose and effect of the ads was to capture, and exploit, "the essence of his person." Simply stated, a jury should decide whether Defendants have "misappropriated" the Naked Cowboy's "identity" for the purpose of commercial "profit."

This court has likewise emphasized the underlying aim of the protection afforded by § 51. In Ali, 447 F. Supp. at 728-29, the court observed that "the interest which underlies protecting the right of publicity is the straightforward one of preventing unjust enrichment by the theft of good will." The court further explained that the right of publicity "protects [a plaintiff's] proprietary interest in the profitability of his public reputation or 'persona.'" In view of this remedial goal, the court held that the publication of the Ali illustration "amounted to a wrongful appropriation of the market value of [his] likeness," and was therefore actionable under § 51.

In Vanderbilt v. Rolls-Royce Motor Cars, Inc., 1990 U.S. Dist. LEXIS 3342, No. 88-CV-8263 (SWK) (S.D.N.Y. Mar. 26, 1990), the defendant car manufacturer ran a magazine ad which contained a quotation attributed to the plaintiff, without the plaintiff's consent. The plaintiff complained that the advertisement implied that he had been paid to sponsor to car. The court held that although the ad misstated plaintiff's exact name, he pled a viable claim under § 51 for the authorized commercial use of his name and good will. Regarding the purpose of the protections afforded under the state law, the court opined as follows:

> Section 51 "is designed to protect... a property interest in his or her 'name', 'portrait' or 'picture', and thus it implicitly requires that plaintiff be capable of identification from the objectionable material itself."

Id. at p. 7 (quoting Cohen, 63 N.Y.2d at 384).

Like the plaintiff in <u>Vanderbilt</u>, the Naked Cowboy seeks to vindicate his proprietary interest in his celebrity persona. Further, the Naked Cowboy has adequately pled that he is capable of identification from the Defendants' advertisements themselves. Notwithstanding any alleged creative twist or alteration, the essence of the Naked Cowboy is readily identifiable in the ads and, as in <u>Vanderbilt</u>, the appropriation can be viewed to imply his sponsorship. Again, the rationale for extending the statute's scope to include images that are "not the plaintiff himself" was the notion of commercial exploitation and implied endorsement. It should also be noted that the <u>Vanderbilt</u> decision makes clear that the use of a similar name which is clearly intended to refer to the plaintiff is sufficient to state a claim under § 51 for the use of one's "name."

Courts which have addressed right of publicity actions arising under the laws of other states have relied upon these same considerations as to the underlying purpose of the right. In <u>White v. Samsung Electronics America, Inc.</u>, 1992 U.S. App. LEXIS, No. 90-55840 (9th Cir. 1992), the plaintiff, "Wheel of Fortune" co-host Vanna White, filed suit after the defendant ran an advertisement depicting a robot wearing a blond wig and engaged in the act of turning game-board letters. Not unlike the present situation, the robot bore no facial resemblance to the plaintiff, or to any human at all. Nonetheless, the court reversed the entry of summary judgment in favor of the defendants as to White's California common law right of publicity claim (as well as her false endorsement claim, as discussed above). The court began its analysis by noting that the right of publicity "developed to protect the commercial interest of celebrities in their identities." <u>Id.</u> at *10. The court then explained that "if the celebrity's identity is commercially exploited, there has been an invasion of his right whether or not his 'name or likeness' is used." <u>Id.</u> The

19

court reasoned that "[i]t is not important *how* the defendant has appropriated the plaintiff's identity, but *whether* the defendant has done so." Id.

Defendants in this case have argued that the White holding is meaningless because the court applied the state's common law right of publicity, rather than its separate statutory codification of same. Defendants assert that White's claim prevailed only because she was not required to prove that her "photograph" or "likeness" was used. This is not accurate. With regard to her California common law claim, the court still required White to prove, as one of the elements thereunder, that the defendant used her "likeness." Id. at 5. Thus, in allowing her claim to proceed to a jury, the court addressed the very issue which is before the Court in this matter: whether the cartoons in question qualify as a "likeness." In holding that the Vanna White robot did constitute a "likeness," the court reasoned as follows:

> [I]f we treated the means of appropriation as dispositive in our analysis of the right of publicity, we would not only weaken the right but effectively eviscerate it. The right would fail to protect those plaintiffs most in need of its protection. Advertisers use celebrities to promote their products. The more popular the celebrity, the greater the number of people who recognize her, and the greater the visibility for the product. The identities of the most popular celebrities are not only the most attractive for advertisers, but also the easiest to evoke without resorting to obvious means such as name, likeness, or voice.

Id. at 10-11.

Turning to the features of the offending robot, the court noted that the blond wig, fancy dress, and the turning of letters "leave little doubt about the celebrity the ad is meant to depict." Id. at 12. In this case, there is likewise little doubt that the cartoons in question purport to depict the Naked Cowboy, as shown by the Defendants' inconspicuous use of a white cowboy hat, white cowboy boots, red-and-blue "star"

accents, white underwear, the name "Peanut Cowboy," and the strumming of an acoustic guitar. Each of these features makes up the Naked Cowboy's distinctive image, and after all—as his name suggests—that is all there is to him.

Finally, it is noted that the right of publicity in many other states is premised upon the same considerations discussed above. *See e.g.* <u>Landham v. Lewis Galoob Toys, Inc.</u>, 227 F.3d 619, 624 (6th Cir. 2000) (holding that an action figure resembling the plaintiff was actionable under Kentucky's right of publicity which is "designed to reserve to a celebrity the personal right to exploit the value of his own identity"); <u>C.B.C. Distribution and Marketing, Inc. v. M.L.B. Advanced Media, L.P.</u>, 443 F. Supp. 2d 1077, 1090 (E.D. Mo. 2006) (observing that the justifications for Missouri's right of publicity include "securing for plaintiffs the commercial value of their fame," "preventing the unjust enrichment of others seeking to appropriate the commercial value of plaintiffs' fame," and "affording protection against false suggestions of endorsement or sponsorship") (quoting *Restatement (Third) of Unfair Competition § 46, Cmt. c* (2005)).

In sum, the scope of the right of publicity has been liberally construed, and the driving force behind this liberal construction is a recognition by many courts, here and elsewhere, that the goal is to afford adequate protection against commercial exploitation of celebrity good will.

## IV.   **CONCLUSION**

Pursuant to the standard set forth in <u>Bell Atl. Corp. v. Twombly</u>, 127 S. Ct. at

1965, Plaintiff has stated viable claims under both § 43(a) of the Lanham Act and § 51 of

the New York Civil Rights Law.  By Defendants' own admission, the Lanham Act claim

requires a "fact-intensive inquiry" on multiple issues, including the question of whether

their advertisements qualify as parodies (assuming the parody defense is even viable in

this case).  Plaintiff's § 51 claim is likewise sufficiently stated in view of the liberal

construction the courts have given to the statutory language, together with the law's

underlying aim of ensuring that celebrities enjoy the fruits of their own hard-earned good

will.

Respectfully submitted,

HALBERSTADT CURLEY LLC

By: _____

    Scott M. Rothman
    (admitted *pro hace vice*)
    1100 E. Hector Street, Suite 425
    Conshohocken, PA 19428
    610 834 8819 (ph)
    610 834 8813 (fx)
    srothman@halcur.com
    *Attorney for Plaintiff*

Date: 5/16/08

*Of Counsel to Plaintiff:*

KEVIN T. MULHEARN, P.C.
    Kevin T. Mulhearn
    60 Dutch Hill Rd. # 8
    Orangeburg, NY 10962
    (845) 398-0361 (ph)
    (845) 398-3836 (fx)
    kmulhearn@ktmlaw.net

**TIMOTHY C. LONG**
ATTORNEY AT LAW
455 South Ludlow Alley
Columbus, Ohio 43215
Phone: (614) 469-1001 ext. 111
Fax: (614) 621-4097
Email: tlong@chutegerdeman.com

January 8, 2008

Via Fax (610-834-8813)

Scott M. Rothman
Halberstadt Curley. LLC
1100 E. Hector Street
Conshohocken, PA 19428

Re:    Robert Burck dba "The Naked Cowboy"

Dear Mr. Rothman:

I am writing on behalf of Chute Gerdeman, Inc. and its affiliated entities (collectively hereinafter "Chute Gerdeman') regarding your letter to Brian Shafley, dated January 2, 2008. First, please be advised that Chute Gerdeman did not create or produce any materials or advertisements, whether in print or video format, featuring the animated blue M & M'S character which you refer to in your letter. Further, Chute Gerdeman did not comment on or have any involvement or participation with or about the content of the video billboards, in any manner whatsoever.

Second, please note that we have forwarded a copy of your demand to the appropriate persons at M&M'S Mars and have been instructed that they will be contacting you directly regarding the positions and demands contained in your letter. However, you are hereby further advised that all work performed by Chute Gerdeman in connection with the M&M'S World New York store in Times Square was done so on a "work for hire" basis and that both the Agreement between the respective parties and the law applicable to the situation dictate that any claims that your client chooses to make regarding these matters shall be applicable to M&M'S Mars and wrongful against Chute Gerdeman. Therefore, please advise your client that Chute Gerdeman will respond to any suit against it regarding these matters with claims for wrongful conduct and attorneys fees.



EXHIBIT
A



Notwithstanding the foregoing, please advise me if you have not heard from M&M'S Mars in the next fourteen (14) days.  Thank you for your attention to these matters.

Very truly yours,

Timothy C. Long

Cc: Brian Shafley

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the foregoing Memorandum of Law in Opposition to Defendant Chute Gerdeman, Inc.'s Motion to Dismiss and Defendant Mars, Incorporated's Motion for Judgment on the Pleadings was were served via electronic mail on the following:

Joseph R. Price, Esquire
Arent Fox LLP
1050 Connecticut Avenue, NW
Washington, DC 20036-53

HALBERSTADT CURLEY LLC

By: _____
Scott M. Rothman

Date: 5|16|08